# UNITED STATES ARMY COURT OF CRIMINAL APPEALS

Before
BURTON, HAGLER, and FLEMING
Appellate Military Judges

**UNITED STATES, Appellee**
v.
**Specialist BRANDON L. DEASON**
**United States Army, Appellant**

ARMY 20150674

Headquarters, 1st Cavalry Division (Rear)(Provisional)
Rebecca K. Connally and Wade N. Faulkner, Military Judges
Lieutenant Colonel Oren H. McKnelly, Staff Judge Advocate

For Appellant:  Captain Steven J. Dray, JA (argued); Colonel Elizabeth G. Marotta, JA; Major Julie L. Borchers, JA; Captain Steven J. Dray, JA (on reply brief); Colonel Mary J. Bradley, JA; Major Julie L. Borchers, JA; Captain Steven J. Dray, JA (on brief).

For Appellee:  Captain Marc Sawyer (argued); Colonel Tania M. Martin, JA; Lieutenant Colonel Eric K. Stafford, JA; Captain Marc Sawyer, JA; Captain Jonathan S. Reiner, JA (on brief).

25 January 2019

--------------------------------
MEMORANDUM OPINION
--------------------------------

*This opinion is issued as an unpublished opinion and, as such, does not serve as precedent.*

HAGLER, Judge:

Appellant challenges the factual sufficiency of his conviction for sexually assaulting MB.  We have reviewed the evidence, which includes a video-recording of appellant's sexual encounter with MB.  The video-recording demonstrates that MB repeatedly gave audible consent—or at least what reasonably appears to be audible consent—to sexual intercourse with appellant.  Considering this evidence, we are not personally convinced that MB was incapable of consenting to the sexual intercourse.

We therefore set aside appellant's conviction of sexual assault and dismiss the specification and charge alleging sexual assault.[1]

Appellant further contends the military judge abused her discretion by denying appellant's motion to suppress statements made by appellant to military police (MPs) and Army Criminal Investigative Command (CID) agents. We agree with appellant that statements he made to the MPs should have been suppressed, but we disagree that his statements to CID or the contents of his cell phone should have been suppressed. Yet, our holding on the suppression of appellant's statements to the MPs does not affect our disposition of appellant's other offenses. Absent the statements that should have been suppressed, the government offered overwhelming evidence that appellant provided alcohol to minors, made a false official statement, and was absent from his place of duty without leave (AWOL).[2]

## BACKGROUND

### A. Events Leading to the Charges

Private (PV2) Avila, a friend of appellant, met MB and MN at a park near Fort Hood, Texas on 31 August 2014. MB was the seventeen-year-old daughter of a local civilian and MN was the seventeen-year-old daughter of a noncommissioned officer (NCO) stationed at Fort Hood. Private Avila, who was nineteen years of age, returned to his on-post residence with MB and MN.[3] He then contacted appellant, invited him to join them, and asked him to bring alcohol, as appellant was twenty-one years old. Appellant agreed, procured alcoholic beverages, met PV2 Avila, and returned to PV2 Avila's residence to join MB and MN. Later that evening, the group

---

[1] A panel with enlisted representation, sitting as a general court-martial, convicted appellant, contrary to his pleas, of one specification of absence without leave, two specifications of violating a lawful general regulation for providing alcohol to minors, one specification of making a false official statement, and one specification of sexual assault, in violation of Articles 86, 92, 107, and 120, Uniform Code of Military Justice, 10 U.S.C. §§ 886, 892, 907, and 120 [UCMJ]. The panel sentenced appellant to 210 days of confinement, reduction to the grade of E-1, forfeiture of all pay and allowances, and a dishonorable discharge. The convening authority approved the sentence as adjudged. Appellant was credited with 177 days of pretrial confinement. This case is before us under Article 66, UCMJ.

[2] We have considered the matters personally raised by appellant pursuant to *United States v. Grostefon*, 12 M.J. 431 (C.M.A. 1982), and find they merit no relief.

[3] Although PV2 Avila's wife and child had recently moved out of the two-bedroom family quarters, PV2 Avila continued to reside there.

2

went to a large local retailer to get more alcohol. Private Avila and the teenagers separated themselves from appellant at the store so it would not appear he was buying the alcohol for them.

Appellant later explained to a CID agent that he purchased the alcohol because he was the only member of the group who was of legal drinking age. Referring to MB and MN, PV2 Avila had texted appellant, "Don't ask how old they are." Appellant later explained to a CID agent that he took this to mean, "They gotta be under twenty one, but hopefully over eighteen." Appellant further admitted, "I knew they were under twenty one, I didn't know their age other than that."

After consuming significant quantities of alcohol, appellant and MB retired to a bedroom, where they engaged in sexual intercourse. Appellant made a video and audio recording of this encounter on his cell phone. The recording shows MB was intoxicated, but it also shows she participated in the sexual acts and gave repeated, explicit verbal consent to sexual intercourse.

Soon after the intercourse, MB began to feel nauseous and vomited. Appellant led her to the bathroom and assisted her into the bathtub. Appellant left the bathroom but returned shortly thereafter and helped MB return to the bedroom. He left her on the bed and departed the bedroom. Approximately half an hour after appellant's sexual activity with MB, PV2 Avila entered the bedroom. Although appellant did not re-enter the room himself, he later reported hearing noises consistent with sexual intercourse from the bedroom where PV2 Avila was alone with MB.

In the meantime, MB's and MN's parents had become increasingly concerned that their daughters did not return home by midnight. MB's mother reported her as missing to local civilian police and MN's father, an NCO, reported her missing to the MPs on Fort Hood. MN's father helped the police find the general location of MB and MN based on her cell phone's location. Although the MPs found the car MB drove to PV2 Avila's residence, they were initially unable to determine which house contained the missing teenagers. For this reason, at approximately 0625, the MPs began to canvass the neighborhood by knocking on doors. This activity awoke PV2 Avila, appellant, MB, and MN, although they did not answer the door.

Shortly thereafter, at approximately 0650, MB and MN exited PV2 Avila's residence and attempted to return to MB's car. The MPs who saw MB and MN described the teenagers' appearance as "intoxicated," "afraid," "distraught," "crying hysterically," and "not in their right mind." The MPs stopped the missing teenagers and radioed for backup. When backup arrived, the MPs knocked on PV2 Avila's door with weapons drawn, announced their presence, and ordered any occupants to exit the building with their hands up. When PV2 Avila and appellant departed the residence, the MPs ordered them to their knees and handcuffed them. The MPs then

separated them and began to question them about what had occurred with the missing teenagers. The MPs did not advise PV2 Avila or appellant of their rights under *Miranda* or Article 31(b), UCMJ. Appellant admitted to providing the group alcohol and claimed he had met the missing teenagers at the movies.[4] PV2 Avila admitted to drinking underage. After approximately fifteen minutes, MPs transported appellant and PV2 Avila to the MP station.

Appellant and PV2 Avila were later taken to the CID office and, around 1130 that morning, a CID agent advised appellant of his Article 31(b) and *Miranda* rights. Appellant acknowledged his rights and signed a written waiver, consenting to an interview by CID. Appellant also gave written consent for CID to search his cell phone. During the interview, appellant offered the story about meeting MB and MN at the movies. The later testimony of MB and MN, however, made it clear that appellant did not meet them at the movies, and they never went to the movies.

On 10 March 2015, appellant was charged with sexually assaulting MB by penetrating her vulva with his penis while she was incapable of consent due to impairment by an intoxicant. On 20 April 2015, after the charges were referred to a general court-martial, appellant did not report for duty and remained absent without leave until 16 May 2015.[5]

## B. The Trial

Prior to trial, appellant moved to suppress his statements to the MPs and CID under various theories, including the violation of Article 31(b), UCMJ. At the pretrial motions hearing, several MPs testified that, at the time they handcuffed and questioned appellant, they did not suspect him of any criminal conduct. The MPs testified that they handcuffed appellant and PV2 Avila for "officer safety."

The military judge made written findings of fact and conclusions of law. Among other things, she found as a matter of fact that the MPs did not suspect appellant or PV2 Avila of any criminal conduct until after the MPs had questioned

---

[4] This was a false story that appellant, PV2 Avila, MB, and MN agreed upon before the girls left PV2 Avila's residence. As MB previously told her mother she was going to the movies, the story appears intended to maintain that falsehood.

[5] The original charges against appellant were withdrawn and dismissed without prejudice, and new charges were preferred against him after he returned to military control.

them and spoken with the missing teenagers.[6] The military judge found the MPs did not formally arrest appellant or PV2 Avila until after the MPs developed probable cause to suspect the two soldiers of offenses.

The military judge concluded as a matter of law that the MPs detained appellant and PV2 Avila upon ordering them out of the house, but they did not "apprehend" or "arrest" them until later. We note the military judge made no conclusion of law as to whether appellant was in "custody" or whether a reasonable person in appellant's position would have believed himself free to leave when the MPs detained him.

Appellant was arraigned on 4 August 2015. On 15 September 2015, two weeks before trial on the merits of appellant's case, the government explained it intended to proceed on the sexual assault charge under two alternate theories of liability, first, that appellant was criminally liable for his own sex act with MB, and second that appellant was vicariously liable for PV2 Avila's sex act with MB. Over defense objection, the military judge allowed the government to proceed under both theories and instructed the panel accordingly.

The panel found appellant guilty of sexually assaulting MB, providing alcohol to MB and MN in violation of a Fort Hood regulation, making a false official statement to a CID agent, and AWOL.

## LAW AND ANALYSIS

Appellant raises five assignments of error, which we shall address in the following order:

First, appellant argues—and the government concedes—the military judge erred by instructing the panel it could convict appellant under a theory of vicarious liability for the sexual acts of PV2 Avila that allegedly took place after appellant's

---

[6] We are, frankly, disturbed that law enforcement officials would approach a private residence in the manner described and handcuff the occupants, all while explicitly professing *no suspicion whatsoever* the occupants had committed any crime. The MPs' actions would be understandable if they had suspected appellant and PV2 Avila of a criminal offense, but the MPs unanimously testified to the contrary. We do not disturb the military judge's finding of fact that the MPs were truthful that they did not suspect appellant of any crime at the time they handcuffed and began to question him. Nevertheless, as discussed below, it is clear to this court that they should have suspected appellant when they did so.

sexual encounter with MB.  We accept the government's concession of error and prejudice.

Second, appellant agues his conviction for sexually assaulting MB is factually insufficient.  We agree.

Third, appellant argues the military judge abused her discretion by not suppressing appellant's statements to the MPs and CID, and by not suppressing the contents of appellant's cell phone.  We agree in part and disagree in part.

Fourth, appellant argues the military judge plainly erred by failing to instruct the panel on the necessary *mens rea* of the appellant as to the age of the persons to whom he provided alcohol.  We conclude any instructional error was harmless, as there was overwhelming evidence appellant knew the recipients of the alcohol were under age.

Fifth, and finally, appellant alleges he suffered from dilatory post trial processing.  We agree and factor the post-trial delay into our relief on appellant's sentence.

## A. Vicarious Liability for Sexual Assault of MB

Appellant was charged with sexually assaulting MB by "penetration of her vulva with his penis, when [MB] was incapable of consenting to the sexual act due to impaired [sic] by an intoxicant and that condition was known or reasonably should have been known by [appellant]." At the government's request, the military judge instructed the panel that it could convict appellant for sexually assaulting MB based on *PV2 Avila* penetrating MB's vulva *with PV2 Avila's penis*.  The government now concedes this instruction was error and that error was not harmless beyond a reasonable doubt.  We accept the government's concession and concur.

Under the UCMJ, an accused may be convicted of an offense as a principal if the accused aided, abetted, or conspired in the commission of the offense.  *See* UCMJ, art. 77; *Manual for Courts Martial, United States*, (2010 ed.), pt. IV, ¶ 5.c.(5).  *See also United States v. Browning*, 54 M.J. 1, 7-8 (C.A.A.F. 2000).  While an accused may be lawfully convicted under a theory of vicarious liability, the accused must have notice as to the offense he or she must defend against.  *See United States v. Wilkins*, 71 M.J. 410, 413 (C.A.A.F. 2012).  Too great a change between pleadings and proof may deprive an accused of such notice, even if the facts proved would themselves constitute a violation of the same statute.  *See United States v. Reese*, 76 M.J. 297, 301 (2017) (although decided on a different basis, the discussion in *Reese* highlights that the defense is entitled to rely on the government's pleadings to determine what it should be prepared to defend against).

In this case, appellant was charged with penetrating MB's vulva with his own penis. The government could have—but did not—separately allege that appellant sexually assaulted MB by penetrating her vulva with PV2 Avila's penis, nor did the government explain it was pursuing alternate theories of liability until two weeks before trial.[7] Under these circumstances, it was error to instruct the panel that appellant could be convicted for PV2 Avila's sexual act upon MB, which was committed outside appellant's presence and approximately thirty minutes after appellant had sexual intercourse with her. Compounding this error was the government trial counsel's extensive argument the panel should convict appellant under the vicarious theory. Under the facts of this case, this error was not harmless.

### B. Factual Sufficiency of the Sexual Assault Conviction

While conceding that we must set aside appellant's conviction for the erroneous panel instruction, the government urges us to allow a rehearing on this charge, arguing that appellant could still be convicted for his own conduct as originally charged. We disagree. We further conclude appellant is protected from further prosecution by principles of double jeopardy.

Under Article 66(c), UCMJ, we may affirm only those findings of guilt that we find "correct in law and fact and determine[], based on the entire record, should be approved." We review both legal and factual sufficiency de novo. *United States v. Washington*, 57 M.J. 394, 399 (C.A.A.F. 2002). In factual sufficiency review, we take "a fresh, impartial look at the evidence," applying "neither a presumption of innocence nor a presumption of guilt." *Id.* (a court of criminal appeals gives "no deference to the decision of the trial court" except for the "admonition . . . to take into account the fact that the trial court saw and heard the witnesses"); *see also*, *United States v. Davis*, 75 M.J. 537, 546 (Army Ct. Crim. App. 2015) (en banc), *aff'd on other grounds*, 76 M.J. 224 (C.A.A.F. 2017) ("the degree to which we 'recognize' or give deference to the trial court's ability to see and hear the witnesses will often depend on the degree to which the credibility of the witness is at issue."). "[A]fter weighing the evidence in the record of trial and making allowances for not having personally observed the witnesses, [we must be] convinced of the [appellant's] guilt beyond a reasonable doubt." *United States v. Turner*, 25 M.J. 324, 325 (C.M.A. 1987).

---

[7] Appellant first became aware of the government's vicarious liability theory during an Article 39a session on 15 September 2015. Despite appellant's possible vicarious liability under Article 77, UCMJ, the language of the specification did not place appellant on notice to defend against the act of penetration by another man's penis during a separate incident.

The government alleged appellant had sexual intercourse with MB when she was "incapable of consenting to the sexual act due to impairment by an intoxicant" and appellant knew "or reasonably should have known" of MB's inability to consent. Appellant's video recording of his sexual encounter with MB was introduced into evidence. The recording is graphic and includes substantial audio content. The recording—particularly the audio—demonstrates MB repeatedly and explicitly consented to sexual intercourse with appellant. Her words and actions show that, although she was under the influence of alcohol, she appeared to understand and appreciate the nature of sexual intercourse and she affirmatively communicated to appellant her decision to engage in sexual intercourse with him. After reviewing the evidence, we are not convinced that MB was incapable of consent or that appellant reasonably should have known she was. The video evidence of the incident is enough to create reasonable doubt in our minds.[8] Thus, we find appellant's conviction of sexual assault factually insufficient on the only theory of liability of which appellant had notice.

We further find a rehearing is not authorized under either theory. The military judge allowed the government to introduce evidence of PV2 Avila's assault of MB, and the government argued extensively for the panel to convict based on vicarious liability.[9] Although appellant was not placed on notice of this theory of liability, he was forced to defend against it, he was convicted of the charge, and he served his sentence. We cannot know which theory was the basis for the panel's verdict, but we need not speculate to conclude appellant was placed in jeopardy under both theories of liability. Thus, allowing a rehearing under either theory would violate principles of double jeopardy.

---

[8] In closing argument, government counsel encouraged the panel to review the video both with the sound on and off. We did so, and the difference in our perception of the sexual encounter was striking. With the sound on, MB's interactive participation is much more apparent, and her inability to consent is much more in doubt. To us, it is entirely possible that the panel might have followed the government's suggestion and relied too heavily on the silent video. This over-reliance would be improper, as there was no evidence that appellant was unable to hear MB during their sexual encounter. While we stop short of finding the government's suggestion error, we do note that it underscores the weakness of the evidence as it relates to the issues of MB's inability to consent and appellant's awareness of such.

[9] The slides used by the government trial counsel during closing argument were attached as an appellate exhibit. Seven of these slides addresses vicarious liability.

### C. Unwarned Statements to the MPs and CID

On brief, appellant primarily argued the military judge should have suppressed the statements he made to the MPs, because he made those statements during an illegal seizure of his person by the MPs. While we discuss this issue briefly, we ultimately find it moot, because the military judge abused her discretion when she concluded that the MPs did not need to advise appellant of his rights when they questioned him as he was detained in handcuffs. We also hold the military judge did not abuse her discretion in admitting his statement to CID and the evidence from his cell phone. First, we will address appellant's Fourth Amendment claim regarding his statements to the MPs. Second, we will discuss appellant's statements to the MPs under an Article 31(b), UCMJ framework. Third, we will address appellant's statements made to the CID agent. Fourth, we discuss the overwhelming evidence supporting appellant's convictions for the remaining offenses, independent of any statements he made the MPs.

### 1. The Terry Stop

The government contends appellant's detention by the MPs was a lawful investigative detention consistent with *Terry v. Ohio*, 392 U.S. 1, 21 (1968). Such a brief investigative detention, not amounting to an arrest, is commonly known as a *Terry* stop. A *Terry* stop, however, requires "the officer has a reasonable suspicion supported by articulable facts that criminal activity 'may be afoot,' even if the officer lacks probable cause." *United States v. Sokolow*, 490 U.S. 1, 7 (1989) (quoting *Terry*, 392 U.S. at 30). For this reason, "A court sitting to determine the existence of reasonable suspicion must require the [government] agent to articulate the factors leading to that conclusion . . . ." *Id*. at 10. Put differently, "To satisfy the reasonable suspicion standard, an officer must have a 'particularized and objective' basis for thinking the detained individual is involved in criminal activity." *United States v. Cortez-Galaviz*, 495 F.3d 1203, 1206 (10th Cir. 2007) (quoting *United States v. Cortez*, 449 U.S. 411, 417 (1981)).

In this case, we agree that the MPs objectively had a reasonable basis to suspect appellant had committed an offense at the time they detained him. The MPs knew two teenagers reported as missing had just walked out of the house. They could see the teenagers were disheveled and visibly distressed, and they could smell alcohol on them. Appellant was one of only two other persons in the residence, and the other, PV2 Avila, admitted he had been drinking underage. Nevertheless, the MPs testified that despite the scene before them—which was replete with reasons to suspect appellant of *some* wrongdoing—they had no subjective suspicion appellant had committed any crime when they handcuffed him with weapons drawn and sat him on the curb.

We need not seek to bridge the gap between the many objective reasons to suspect appellant of wrongdoing, and the subjective lack of suspicion to which the MPs later professed. At trial, appellant moved to suppress his statements to the MPs based on the lack of any rights warning at the time the MPs questioned him. The test for whether Article 31(b) warnings were required is entirely objective. Thus, we resolve the issue based on the MPs' clear violation of Article 31, UCMJ.

### 2. *The Failure to Advise Appellant of his Rights*

Article 31(b), UCMJ provides that military personnel may not "request any statement" from "a person suspected of an offense" without first advising the person suspected "that he does not have to make any statement" and "any statement made by him may be used as evidence against him in a trial by court-martial." UCMJ, art. 31(b). Whether an individual is a "person suspected of an offense" within the meaning of Article 31(b) is a question of law based on an objective standard. *United States v. Muirhead*, 51 M.J. 94, 96-97 (C.A.A.F. 1999); *United States v. Meeks*, 41 M.J. 150, 161 (C.M.A. 1994). The objective standard is: "whether a reasonable person should consider appellant to be a suspect under the totality of the circumstances." *Meeks*, 41 M.J. at 161 (citing *United States v. Leiffer*, 13 M.J. 337, 343 (C.M.A. 1982).

Statements taken in violation of Article 31(b) are considered "involuntary" for the purpose of the rules of evidence and are generally inadmissible at courts-martial against the person from whom they were obtained. *See* Military Rule of Evidence (Mil. R. Evid.) 305(c)(1). Military Rule of Evidence 305(a) directs that involuntary statements must be treated under Mil. R. Evid. 304. Evidence derived from involuntary statements is generally inadmissible at courts-martial. *See* Mil. R. Evid. 304(b).[10]

The MPs plainly had an objective basis to suspect appellant of an offense at the time they questioned him repeatedly about what he had done with the missing teenagers. The fact that the MPs professed no suspicion does not insulate them from

---

[10] Although evidence derived from simple *Miranda* violations is generally not suppressed, s*ee United States v. Patane*, 542 U.S. 630, 636 (2004), the Military Rules of Evidence provide that a military accused "may claim the most favorable privilege provided by the Fifth Amendment to the United States Constitution, Article 31, *or these rules*." Mil. R. Evid. 301(a) (emphasis added). Thus, absent an exception, evidence derived from a violation Article 31(b) should be suppressed, even if on the strength of Mil. R. Evid. 304 and 305 alone. *See also United States v. Mitchell*, 76 M.J. 413, 419 (C.A.A.F. 2017).

the requirement to provide appellant Article 31(b) warnings before questioning him. *See Muirhead,* 51 M.J. at 96-97.

Suspicion is a low standard. It does not rise even to the level of probable cause. The MPs knew appellant was one of only two other persons in the residence where the missing teenagers were located and that the other, PV2 Avila, had admitted to drinking underage. The MPs knew the teenagers had been reported missing and appeared intoxicated and highly distraught. A reasonable person would have suspected—*at a minimum*—that appellant had aided and abetted in the provision of alcohol to minors.

Because the MPs were required to advise appellant of his rights under Article 31(b) before questioning him, yet failed to do so, we hold the military judge abused her discretion in denying appellant's motion to suppress statements made by appellant to the MPs. This error is of little overall consequence, however, because we also conclude the military judge did not abuse her discretion in denying appellant's motion to suppress his later statements made to CID.[11]

*3. Appellant's Statements to CID*

An accused's statement is inadmissible if under the totality of circumstances it was involuntarily given. A statement is involuntary if the "defendant's will was overborne" when he or she made it, whereas a statement is voluntary if it is the "product of an essentially free and unconstrained choice by its maker." *Schneckloth v. Bustamonte*, 412 U.S. 218, 225-26 (1973); *Culombe v. Connecticut*, 367 U.S. 568, 602 (1961). The fact an accused was advised of his rights weighs in favor of finding subsequent statements were voluntary, but "does not, of course, dispense with the voluntariness inquiry." *Dickerson v. United States*, 530 U.S. 428, 444 (2000). "Determination of whether a statement is involuntary 'requires more than a mere

---

[11] We would reach essentially the same result under the Fifth Amendment and *Miranda v. Arizona*, 384 U.S. 436 (1966). The military judge concluded appellant was never formally arrested, but she made no conclusion as to whether appellant was in custody when he was handcuffed by officers with weapons drawn and sat on the curb for interrogation. Were we to reach the *Miranda* issue, we would find appellant was in custody at that time and any reasonable person in appellant's position would have believed himself to be in custody. We would further conclude the custody exceeded the scope of a *Terry* stop under the unique circumstances of this case. In any event, appellant is entitled to the greater protection afforded as between the Constitution, Article 31(b), UCMJ, or the rules of evidence. We therefore apply the more protective standards of Article 31(b) and Mil. R. Evid. 304 and 305 to resolve appellant's claim of error.

color-matching of cases.' It requires careful evaluation of all the circumstances of the interrogation." *Mincey v. Arizona*, 437 U.S. 385, 401 (1978) (quoting *Reck v. Pate*, 367 U.S. 433, 442 (1961)).

Our superior court has provided guidance for cases where there are multiple admissions by an accused, and the voluntariness of a subsequent statement is challenged on the grounds that it is tainted by an earlier, illegally obtained statement:

> Where a confession is obtained at a lawful interrogation that comes after an earlier interrogation in which a confession was obtained due to actual coercion, duress, or inducement, the subsequent confession is presumptively tainted as a product of the earlier one. On the other hand, where the earlier confession was "involuntary" only because the suspect had not been properly warned of his panoply of rights to silence and to counsel, the voluntariness of the second confession is determined by the totality of the circumstances. The earlier, unwarned statement is a factor in this total picture, but it does not presumptively taint the subsequent confession.

*United States v. Cuento*, 60 M.J. 106, 108-09 (C.A.A.F. 2004).

Although appellant made some unwarned statements to the MPs, we conclude his later, warned statements to CID were voluntary and not derived from the earlier unwarned statements. Further, appellant's consent to CID searching is cell phone was wholly voluntary.

As discussed above, the MPs had ample reason to suspect appellant of at least some criminal conduct when they placed him in handcuffs. The MPs soon established probable cause to believe appellant had provided alcohol to minors and sexually assaulted MB, based on statements by PV2 Avila, MB, and MN. Probable cause was further strengthened by the CID interviews of MB and MN which took place before CID interviewed appellant. Thus, even if there were a Fourth Amendment violation during appellant's initial detention by the MPs, any deficiency had long-since been cured.

By the time appellant was read his rights by a CID agent at approximately 1130, more than four hours had elapsed since his unwarned statements to the MPs. Appellant reviewed his rights in writing, indicated he understood them, and agreed to waive them by speaking with the CID agent. The CID agent did not use harsh interrogation methods and was not threatening or aggressive when he questioned appellant.

Although appellant made unwarned, and thus legally involuntary, statements to the MPs, these statements were not particularly inculpatory. In fact, his false statement to the MPs—that he met the teenagers at the movies—was apparently intended to be exculpatory. We assess appellant's statements to the MPs played no significant role in his later choice to speak with the CID agent. For the foregoing reasons, we find the totality of the circumstances demonstrate appellant's statements to CID were freely given, as was his consent for CID to search his cell phone.

*4. The Independent Evidence of Appellant's Remaining Offenses is Overwhelming*

As we are setting aside and dismissing appellant's conviction for sexual assault, we need not discuss whether appellant's statements to the MPs prejudiced him on that charge.

Appellant committed the offense of AWOL after he was interviewed by the MPs and CID. In fact, appellant went AWOL when he was pending the charges stemming from his CID interview, so his statements to the MPs had nothing to do with that charge. Similarly, appellant made a false official statement to a CID agent subsequent to his statements to the MPs. The falsehood of appellant's statement that he met MB and MN at the movies was overwhelmingly established at trial by MB and MN themselves. Thus, appellant's conviction on that charge was secured by evidence independent from any statements he made to the MPs.

Finally, appellant's convictions for providing alcohol to minors were supported by overwhelming independent evidence, including his statements to CID, the receipt for the alcohol, and the testimony of MB and MN. Thus, we find the admission of appellant's statements to the MPs was harmless error with respect to the two specifications of providing alcohol to minors.

*D.* Mens Rea *Regarding Providing Alcohol to Minors*

Appellant alleges—and the government concedes—the military judge did not adequately instruct the panel on what *mens rea* appellant must have had as to the ages of MB and MN to convict him of providing alcohol to them in violation of a regulation. Accepting the government's concession of error, we also agree with the government that the error was harmless beyond a reasonable doubt, because the evidence overwhelmingly shows appellant was at least reckless as to the ages of MB and MN. In fact, appellant admitted he believed MB and MN were under twenty-one years of age when he provided them alcohol.

The Fort Hood regulation in question states it is an offense "for a person to purchase an alcoholic beverage for or give or knowingly make available an alcoholic beverage to anyone under [twenty-one] years of age." Appellant argues that as a matter of simple grammar, the adverb "knowingly" only modifies the verb "make

available." Therefore—so the argument goes—appellant could have been convicted under a theory of strict liability for purchasing alcohol for MB and MN or giving alcohol to MB or MN. The military judge read the relevant portion of the regulation to the panel, but she did not provide the panel any additional instructions regarding what, if any, *mens rea* appellant need have had in order to violate the regulation.

When interpreting criminal statutes and punitive regulations that do not specify a *mens rea*, courts must apply to the statute or regulation "that *mens rea* which is necessary to separate wrongful conduct from 'otherwise innocent conduct.'" *Elonis v. United States*, 135 S. Ct. 2001, 2010 (2015) (quoting *Carter v. United States*, 530 U.S. 255, 269 (2000)). In this regard, mere negligence will not do. *See id.* at 2012-13; *United States v. Gifford*, 75 M.J. 140, 147 (C.A.A.F. 2016). Our superior court has held recklessness is the minimum *mens rea* necessary to separate innocent from criminal conduct unless the legislature[12] specifies otherwise, or in the case of certain public welfare offenses. *See Gifford* 75 M.J. at 147. Our superior court has further held that the provision of alcohol to minors is not a public welfare offense. *Id.* Therefore, if no *mens rea* is specified, an accused must be at least reckless as to the age of the individual to whom he is providing alcohol in order for criminal liability to attach. *Id.* at 147-48. *See also United States v. Tucker*, __M.J.__ (C.A.A.F. 29 Nov. 2018).

With this in mind, we agree the military judge erred in not instructing the panel on the *mens rea* necessary to convict appellant of violating the regulation. Under the circumstances of this case, however, such an error was harmless beyond a reasonable doubt.

Appellant admitted to CID that he was "obviously the only one old enough to buy" alcohol. Although MB never personally told appellant her age, she, MN and PV2 Avila separated themselves from appellant at the store, so it would not appear appellant was purchasing the alcohol for them. Private Avila had warned appellant, "Don't ask how old they are," regarding MB and MN, which appellant understood to mean, in his words, "They gotta be under twenty one, but hopefully over eighteen." Appellant further admitted, "I knew they were under twenty one, I didn't know their age other than that."

Under these circumstances, any reasonable factfinder would have concluded appellant was—at a minimum—reckless as to the age of MB and MN beyond a reasonable doubt.

---

[12] Or the promulgating authority in the case of general orders and regulations.

*E. Dilatory Post-Trial Processing*

Appellant alleges the 473 days it took the government to complete post-trial processing of his case warrants relief under Article 66(c), UCMJ.[13] This court applies a four-factor balancing test to determine whether such presumptively unreasonable delay is, in fact, unreasonable in a given case. *United States v. Moreno*, 63 M.J. 129, 135 (C.A.A.F. 2006) (citing *Barker v. Wingo*, 407 U.S. 514, 530, (1972)). The factors are: "(1) the length of the delay; (2) the reasons for the delay; (3) appellant assertion o the right to timely review and appeal; and (4) prejudice." *Id.* (further citations omitted).

In this case, first, the length of the delay is substantial. The government exceeded the threshold of presumptively unreasonable delay by nearly a year.

Second, the government had an opportunity to provide good reasons for this delay. It did not. On brief, the government offers no persuasive justification or excuse for the time it took for appellant's case to reach this court.[14]

Third, the government argues appellant never asserted his right to speedy post-trial processing until the submission of his brief. Appellant's failure to assert his right to speedy post-trial processing is, however, but one of the three factors. It is also the only factor to weigh in the government's favor.

Fourth, as for prejudice, the government conceded on brief that error at trial required this court to set aside appellant's conviction of sexual assault. As discussed above, we go further and dismiss appellant's conviction of sexual assault as factually insufficient. An "unauthorized conviction has 'potential adverse collateral consequences that may not be ignored,' and constitutes unauthorized punishment in and of itself." *United States v. Savage*, 50 M.J. 244, 245 (C.A.A.F. 1999) (quoting *Ball v. United States*, 470 U.S. 856, 865 (1985)). Here, appellant was prejudiced by the additional time appellant lived under the shadow of the conviction we now set aside.

---

[13] Appellant asserts the delay attributable to the government was 473 days, while the government claims the number was 484 days. In either event, the government delay far exceeded the threshold of being presumptively unreasonable—120 days.

[14] Rather than offering an overt justification for the delay on brief, the government describes the delay at various steps of post-trial processing. While this highlights some understandable reasons for delay—e.g., 133 days to generate the 2,241-page record of trial—it also highlights some glaring deficiencies—e.g., fifty-five days to serve the Staff Judge Advocate's Recommendation on the defense counsel.

As the greater weight of the relevant factors balance in appellant's favor, we agree the dilatory processing of appellant's case warrants relief. We factor such relief into our consideration of an appropriate sentence in our decretal paragraph.

## CONCLUSION

Appellant's conviction of The Specification of Charge IV and Charge IV are SET ASIDE and both The Specification of Charge IV and Charge IV are DISMISSED. The remaining findings of Guilty are AFFIRMED.

Reassessing the sentence on the basis of the errors noted, the entire record, and in accordance with the principles of *United States v. Sales*, 22 M.J. 305, 308 (C.M.A. 1986) and *United States v. Winckelmann*, 73 M.J. 11, 15-16 (C.A.A.F. 2013), we affirm only so much of the sentence as provides for a bad-conduct discharge, 210 days of confinement, reduction to the grade of E-1, and forfeiture of all pay and allowances.

All rights, privileges, and property of which appellant has been deprived by virtue of that portion of his sentence set aside by this decision are ordered restored. *See* UCMJ arts. 58b(c) and 75(a).

Senior Judge BURTON and Judge FLEMING concur.

FOR THE COURT:

MALCOLM H. SQUIRES, JR.
Clerk of Court

16